UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No.: 25-cr-00153 (JWB/DJF)

---

United States of America,

        Plaintiff,

v.                                **DEFENDANT'S POSITION WITH**
                                        **RESPECT TO SENTENCING FACTORS**

Michael Paul Lewis,

        Defendant.

---

## INTRODUCTION

    Michael Lewis is not a violent person, nor is he a hateful one. He is a fifty-two-year-old man who, for much of his life, quietly carried the weight of depression, anxiety, shame, isolation, and untreated addiction. These unresolved struggles led to a single and deeply regrettable lapse in judgement. On March 26, 2025, in the midst of a severe and alcohol-fueled mental health crisis, Mr. Lewis left a reckless and devastating voicemail threatening a United States Congressperson. The message was vile, frightening, and completely out of character. It was an impulsive decision that Mr. Lewis will regret for the rest of his life.

    Since that day, Mr. Lewis has taken extraordinary and immediate steps to look inward and ensure that such conduct will never occur again. He pursued this transformation not because a court ordered it, but because he recognized he needed to change. He completed intensive dual-diagnosis treatment to address both his alcohol

addiction and underlying mental health conditions that were long neglected. He maintained complete sobriety for over seven months and reengaged with therapy and support programs. Most importantly, he confronted the unresolved trauma that fueled his substance abuse for decades and demonstrated profound remorse for his actions.

This case presents an opportunity for the Court to recognize that not all federal offenses require incarceration to achieve the goals of sentencing. While threatening a government official is undeniably serious, the unique circumstances and mitigating factors present in Mr. Lewis's case demonstrate that a probation sentence of two years would be sufficient, but not greater than necessary, to comply with the purposes of sentencing outlined in 18 U.S.C. § 3553. Further, such a sentence would fully effectuate Congress' explicit directives to courts in imposing a statutorily reasonable sentence.

## SENTENCING GUIDELINES CALCULATIONS

### Mr. Lewis's Calculations

On September 3, 2025, Mr. Lewis pleaded guilty to Count I of the Indictment – Threatening to Murder a United States Official in violation of 18 U.S.C. § 115(a)(1)(B). At the time of his plea, the parties agreed the adjusted offense level to be 12 (base offense level 12 minus 4 for a single instance evidencing little or no deliberation, plus 6 because the victim was a US congressperson, for an adjusted offense level of 14, minus 2 levels for acceptance of responsibility) and anticipated a criminal history score of 0 placing him in category I, which resulted in a Sentencing Guideline Range of 10-16 months.

**Comparable Variance Cases**

Notably, in *Gall v. United States*, the most apt example of a factually similar case, the defendant's guideline range was 30-37 months, and he received a sentence of 36 months of probation. *Gall v. United States*, 552 U.S. 38, 40 (2011). Such a variance from a guideline sentence is prevalent in the post-*Booker* world of sentencing discretion. *See United States v. Howe*, 543 F.3d 128, 130 (3rd Cir. 2008) (probationary sentence where guidelines called for 18-24 months sentence); *United States v. Tomko*, 562 F.3d 558, 573 (3rd Cir. 2008) (Defendant sentenced to three years of probation where advisory Guidelines called for 12-18 months); United States v. Carter, 538 F.3d 784 (7th Cir. 2008).

## ARGUMENT

### I. The Federal Sentencing Standard

This Court has broad discretion and the responsibility "to impose a sentence sufficient, but not greater than necessary, to comply with the basic aims of sentencing." *Rita v. United States*, 551 U.S. 338, 347 (2007). The Sentencing Guidelines are advisory, not mandatory. *See United States v. Booker*, 543 U.S. 220, 245-246 (2005); *Gall v. United States*, 552 U.S. at 41. The recommended guidelines remain a factor in sentencing but serve only as a starting point and should not be automatically presumed reasonable by the district court. *Id.* at 49–50. Rather, after hearing the parties' sentencing arguments, the judge should then "consider all of the 18 U.S.C. § 3553(a) factors to determine whether they support the sentence requested by a party." *Id*.

We are confident this Court is aware of these basic aims, which includes consideration of the nature and circumstances of the offense and the history and characteristics of the defendant.  *See* 18 U.S.C. § 3553(a)(1); *United States v. Chase*, 560 F.3d 828 (8th Cir. 2009).  This is consistent with the basic notion that the sentencing judge is "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).  Indeed, it can no longer be disputed that to blindly impose a guideline sentence and ignore personal circumstances of the defendant and other mitigating factors would result in a sentence at odds with the command of legislature. *See United States v. Feemster*, 572 F.3d 455 (8th Cir. 2009). Here, a review of the § 3553(a) factors as applied to Mr. Lewis's individual circumstances demonstrates that a probationary sentence of two years with conditions is sufficient to satisfy the statutory purposes of sentencing.

    II.    **18 U.S.C. 3553(a) Factors**

        **A. The Nature and Circumstances of the Offense and Mr. Lewis' History and Characteristics Support a Sentence Below the Applicable Advisory Guideline Range**

**The Offense**

On March 26, 2025, Mr. Lewis called the office of the victim and left a vulgar 26-second-long voicemail threatening to kill her. The language used was disturbing and wholly unacceptable. Mr. Lewis does not seek to minimize or excuse his words. However, several aspects of the offense conduct support a finding that this was an isolated, impulsive act under the influence of alcohol, rather than a carefully planned or

ideologically motivated threat. Although understandably frightening for the victim, Mr. Lewis's Presentence Investigation Report ("PSR") correctly notes that "there is no evidence to indicate that Lewis planned to carry out his threat to physically harm the victim . . ." (PSR ¶ 85). He made no travel arrangements, possessed no weapons, and took no steps toward acting on his words.

As his PSR highlights, Mr. Lewis identified himself by name and location at the beginning of the call, which is not the typical behavior of someone genuinely planning violence. *Id*. Nor does Mr. Lewis have any history of threatening politicians. The offense occurred during a period where Mr. Lewis had been "spending much of his time drinking alcohol excessively, gambling, and 'doom scrolling' on social medial while isolating himself from family and friends." (PSR ¶ 11). He described this as "a very dark time" in his life. *Id.*

Mr. Lewis immediately regretted his actions. He told the FBI, "it was wrong to call her, and he regretted making the call afterwards." (PSR ¶ 8). The next day, he "only vaguely remembered the call because of his intoxication and was not sure about the exact words he used." (PSR ¶ 11). When he was shown the transcript of his call during an interview with the FBI, he felt "ashamed." *Id*.

The PSR correctly notes that Mr. Lewis "likely saw something covered on the news or posted on social media regarding [the victim's] positions on lesbian, gay, bisexual, transgender, and queer (LGBTQ) issues." (PSR ¶ 11). As a gay man, Mr. Lewis "described being upset about the 'unrelenting' anti-LGBTQ messaging that has targeted the community, especially the 'hurtful language' from politicians including [the victim]."

*Id*. This context does not excuse Mr. Lewis's conduct or the harm he caused, but it provides important insight into his state of mind at the time of the offense. He was not motivated by a desire to advance a political agenda through violence or to terrorize elected officials. Rather, without meaningful thought, Mr. Lewis inappropriately lashed out in anger and pain at someone he perceived as attacking his community and identity.

**The Offender**

Mr. Lewis was born on April 13, 1973, in Des Moines, Iowa, as the younger of two children. He was raised in a middle-class household by his parents, Paul and Mary Lewis. Although his childhood held many positive memories, they had their unique struggles beneath the surface. His father, considered an alcoholic by his family, was frequently intoxicated, which created tension and distance in the home. (PSR ¶ 34). His father's alcohol dependence resulted in poor physical health that ultimately contributed to his death from complications of pneumonia in February 2005. *Id*.

When Mr. Lewis was twelve, his sister entered substance abuse treatment, which caused resentment as the family focused their attention to her and Mr. Lewis often felt "left to figure things out on [his] own," including when he was bullied in high school. (PSR ¶ 35). This led to early substance use as self-medication at age sixteen. *Id*. Yet despite this early alcohol use, he maintained adequate academic performance and held jobs outside of school. *Id*.

Near the end of high school, his parents separated. (PSR ¶ 36). Lewis had been accepted to a four-year university but decided to forego that opportunity to live with his father while attending community college, concerned about his alcoholic father's well-

6

being and feeling he needed to "watch after" his father. *Id*. Eventually, Mr. Lewis obtained an associate's degree from Des Moines Area Community College in 1994. *Id*. In 2000, at age 27, he received an employment offer from BI Worldwide in Minnesota. *Id*. He moved to Minneapolis and worked his way up over 25 years to Managing Director of Information Technology, overseeing 18 employees and earning approximately $165,000 annually. (PSR ¶ 56). In 2008, he started a relationship with his partner, Brandon Elliott. (PSR ¶ 36). They married in 2014, owned a home and cared for two dogs together. *Id*. His marriage was a great source of joy and stability for him.

But the issues he carried from childhood were never properly addressed. Mr. Lewis was first diagnosed with depression and anxiety in 2016 and occasionally participated in counseling, but he was not willing to give up alcohol as recommended. (PSR ¶ 44). In 2018, his depression reached such depths that he had "an incident of severe depression that resulted in 'a weak attempt' of suicide by carbon monoxide poisoning." *Id*. He followed up with counseling but stopped attending by 2021. *Id*.

Mr. Lewis's alcohol use increased in the late 2010s and, by his own admission, he "put too much energy into drinking and not enough energy into the relationship" with Elliott. (PSR ¶ 37). They began having frequent arguments and separated in 2018, though they continued living together as roommates. *Id*. During the COVID-19 pandemic, his alcohol use became a daily habit in 2021. (PSR ¶ 50). This created stress and tension with Elliott and Mr. Lewis eventually moved out to live alone. Isolating himself from loved ones, his life spiraled and his substance abuse escalated to an all-time high. It was during this dark period where he made the call that brings him before this Court.

**Extraordinary Rehabilitation and Accountability**

Since the offense, Mr. Lewis has done far more than accept responsibility. Six days after his arrest, Mr. Lewis entered an inpatient dual diagnosis treatment program at the PRIDE Institute pursuant to Court Order. (PSR ¶ 40). While his entry into treatment was legally required, his decision to enter an in-patient program and his engagement in that treatment was not superficial or performative. Mr. Lewis's progress in treatment was driven by a sincere desire to regain control of his life, not by a calculated effort to mitigate punishment. He recognized that his substance use was placing him and others at risk, and he committed fully to the therapeutic process. For Mr. Lewis, this was not merely "checking a box" to satisfy a condition of release, but rather the beginning of a profound personal transformation and commitment to sobriety.

For 35 days, he lived at PRIDE Institute, participating in intensive therapy to address his severe alcohol use disorder and underlying mental health condition. (PSR ¶ 52). He learned about the connection between unprocessed grief, feelings of abandonment, and substance use. He developed coping skills for stress, anger, and discrimination. He learned his alcohol use was self-medication for pain never properly addressed. When he completed the program on May 27, 2025, the treatment team made clear recommendations: return to home and workplace; continue complying with legal issues; attend support group meetings; attend mental health therapy sessions; engage in more healthy activities. (PSR ¶ 45). Mr. Lewis has followed every single one of these recommendations without exception.

8

Since completing treatment, Mr. Lewis has maintained complete sobriety for over 7 months. (sobriety date April 16, 2025) (PSR ¶ 52). This is not just abstinence, but active recovery. He attends Alcoholics Anonymous meetings regularly and has obtained an AA sponsor who provides support and accountability. (PSR ¶ 52). He has a therapist at Catalyst Mental Health in Minneapolis whom he meets with on a weekly basis. (PSR ¶ 46). He takes his prescribed medication for depression and anxiety as directed. (PSR ¶ 46). He has abstained from gambling, recognizing that his history of compulsive gambling was associated with his alcohol use. (PSR ¶ 47).

Remarkably, Mr. Lewis has maintained his full-time employment throughout these legal proceedings. (PSR ¶ 56). His employer has been extraordinarily supportive, even placing him on a performance improvement plan after his guilty plea rather than terminating him. This performance plan required regular check-ins, documented progress, and testing. (PSR ¶ 41). Mr. Lewis successfully completed this plan, all while facing federal charges and the stress of not knowing his fate. His supervisor now refers to him as "pre-Mike" and "post-Mike" when discussing events before and after his treatment, recognizing the profound change in him. *Id*.

Mr. Lewis demonstrated genuine insight that goes beyond acknowledging guilt. He described his behavior as "careless and reckless," his threats as "an attack on that person despite having no intent to actually carry out" his statements. (PSR ¶ 12). He knows that nobody deserves to experience that level of fear without knowing what threats are real or "just words." *Id*. He now realizes he was part of the problem in furthering a climate of political violence, and he feels a degree of responsibility for that climate. He

9

notes that he remains passionate about LGBTQ rights but is now using "more appropriate channels and not becoming consumed by anger." *Id*.

Mr. Lewis has minimal criminal history—Category I with zero points. (PSR ¶ 29). His only prior convictions are two driving while impaired offenses from 2005 and 2006—nearly 20 years ago—both resulting in probation which he successfully completed. (PSR ¶¶ 26-27). Specifically noted in his PSR, "he has no history of violence or prior felony offenses, and he has otherwise maintained a mostly successful and law-abiding lifestyle" and "he has demonstrated significant post-offense rehabilitation efforts intended to address the underlying alcohol use and mental health issues that seemingly contributed to his criminal behavior." (PSR ¶ 85).

With his demonstrated commitment to sobriety, ongoing treatment, deep remorse, and genuine acceptance of responsibility, Mr. Lewis possesses the characteristics necessary for lasting rehabilitation. His transformation into "new-Mike" supports a probationary sentence.

> **B. The Need to Impose a Sentence that Reflects the Seriousness of the Offense, Promotes Respect for Law, Provides Just Punishment, Adequate Deterrence, and Corrective Treatment Can be Accomplished with a Below Guideline Sentence**

**Probation is Not Lenient**

A sentence of probation is hardly a slap on the wrist. Mr. Lewis will be subject to substantial restrictions while on probation, and the punishment imposed through his federal prosecution has already been substantial. As the Court in *Gall* recognized, probation is "not 'an act of leniency' [but] 'a substantial restriction of freedom.'" 552

U.S. at 44. Probationers "do not enjoy 'the absolute liberty to which every citizen is entitled.;' *Id*. at 48 (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)). Mr. Lewis was arrested and fingerprinted, experiencing the shock and humiliation of being taken into custody. He has been subject to pretrial supervision with conditions for over seven months, which he has successfully abided by. He has had to disclose his offense to his employer of 25 years and endure the professional embarrassment and uncertainty that followed. He has lived with the knowledge that he committed a serious federal offense and caused fear to another person. He will have a federal felony conviction that will follow him for the rest of his life, affecting his employment prospects, housing opportunities, ability to vote, and standing in the community. If imprisonment is imposed, he "believes he will be terminated" from his employment that he has worked diligently to maintain. (PSR ¶ 56).

A sentence of two years of probation with intense supervision over Mr. Lewis's life will also be followed by a period of supervised release. In the event that Mr. Lewis chooses a life that is inconsistent with the changes he has made in the last seven months, this Court can, and most assuredly would, commit Mr. Lewis to a term of imprisonment.

**Respect for the Law**

Respect for the law is promoted not just through harsh punishment, but through sentences that are fair, proportionate, and tailored to the individual circumstances of the offender. A sentence that recognizes Mr. Lewis's extraordinary efforts at rehabilitation demonstrates the justice system values redemption and second chances while still ensuring accountability. As the Court in *Gall* observed, in some cases, "imprisonment

may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54. In this case, imposing incarceration on a 52-year-old man who has demonstrated significant growth and genuine remorse risks diminishing, rather than enhancing, respect for the law by failing to credit the real progress already achieved.

**Deterrence**

Deterrence is an important sentencing consideration that the Court must weigh under 18 U.S.C. § 3553(a)(2)(B). Mr. Lewis does not dispute that deterrence is a legitimate and necessary goal of sentencing. However, the question is what level of punishment adequately achieves deterrence in this particular case. While locking someone up for an extended period certainly has a specific deterrent effect for the individual who committed the crime, the vast body of research demonstrates the length of a sentence has little deterrent effect with the general population[1]. On the real-world question of whether increases in penalties significantly reduce the incidence of serious crimes, "the consensus conclusion of governmental advisory bodies in many countries is maybe, a little, at most, but probably not."[2]

Deterrence as a policy goal in this case should not be overemphasized. Mr. Lewis has already been profoundly deterred by his arrest and prosecution. That conclusion is

---

[1] Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 Crime & Just. 199, 201 (2013) (concluding "there is little evidence that increases in the length of already long prison sentences yield general deterrent effects that are sufficiently large to justify their social and economic costs").
[2] Michael Tonry, *Sentencing Guidelines* 137 (Norval Morris, ed., 1996).

consistent with the probation officer's assessment which notes, "Based on Lewis's criminal record and reduced likelihood of engaging in similar conduct if he maintains sobriety, he might be adequately deterred by his federal prosecution and any length of imprisonment that may be imposed." (PSR ¶ 86).

As for general deterrence, the certainty of apprehension and punishment – not its severity – is what deters crime.[3] Mr. Lewis's prosecution, including his arrest, FBI investigation, federal conviction, and sentencing sends a strong deterrent message. Others who might consider making similar threats will see that such conduct will be taken seriously and result in federal charges.

### Corrective Treatment is the Most Effective Manner

Finally, the probation officer concluded that Mr. Lewis's "positive adjustment to pretrial supervision and adherence to treatment programming since the commission of his offense indicates his correctional programming needs can be effectively provided in a community or custodial setting." (PSR ¶ 87). This aligns with the Court's longstanding recognition that in some cases, rehabilitation is often more effective outside prison walls. Had Congress intended to mandate imprisonment for all violations of 18 U.S.C. § 115(a)(1)(B), it could have done so by establishing a mandatory minimum sentence or by explicitly prohibiting probation for this offense. Congress has not done so. Indeed, the absence of mandatory minimum sentence for this offense, in contrast to many other

---

[3] Nagin, *supra* at 200.) ("I conclude, as have many prior reviews of deterrence research, that evidence in support of the deterrent effect of various measure of the certainty of punishment is far more convincing and consistent than for the severity of punishment")

federal crimes, demonstrates Congressional recognition that some violations may warrant nonincarcerated sentences.

Mr. Lewis presents a low risk of recidivism. Research consistently shows that community-based treatment is more effective than incarceration at reducing recidivism for defendants whose offenses were driven by addiction.[4] This is particularly applicable to Mr. Lewis's case, where alcohol was the main driving factor that led to his criminal conduct. Indeed, Mr. Lewis's treatment needs are better served in the community, where he has established relationships with providers, has been able to successfully implement tools he learned in treatment, and where he has a strong support system. At 52 years old, Mr. Lewis is also at an age where recidivism rates decline significantly.[5] Combined with his low criminal history, strong family support, and stable 25-year employment, the likelihood of recidivism is minimal.

Mr. Lewis has demonstrated not by his words, but through his actions, that he is committed to recovery. Mr. Lewis has confirmed that he has "no desire to drink alcohol anymore." (PSR ¶ 50). He feels supported by the network he has built within his community. He holds strong bonds with his family and communicates "regularly with his sister who is at a similar phase of recovery." (PSR ¶ 40).

---

[4] Redonna K. Chandler, Bennett W. Fletcher & Nora D. Volkow, *Treating Drug Abuse and Addiction in the Criminal Justice System: Improving Public Health and Safety*, 301 JAMA 183 (2009).

[5] "Recidivism rates decline relatively consistently as age increases," from 35.5% for offenders under age 21, to just 9.5% for offenders over age 50. U.S. Sentencing Commission, Measuring Recidivism (2004), http.//www.ussc.gov/publicat/Recidivism_General.pdf.

Beyond complying with pretrial supervision and participating in treatment programs, Mr. Lewis has been "engaging in activities to help self-regulate his emotions and manage his anger (such as yoga and Zen meditation), performing volunteer work at People Serving People and Community Kitchen in Minneapolis (such as serving and preparing meals for the homeless), [and] finding non-alcohol related activities with friends." (PSR ¶ 40). The isolation of incarceration would only regress this already effective path towards sobriety and rehabilitation. Community-based supervision is best suited to support his continued progress while still achieving the purposes of sentencing.

## CONCLUSION

Mr. Lewis is not the man he was on March 26, 2025. He stands before the Court as someone who has confronted the worst version of himself and taken decisive, consistent action to ensure it never resurfaces. Mr. Lewis distinguishes from defendants for whom incarceration is necessary, and the Court should exercise the discretion they have been vested with by Congress. Incarceration would jeopardize both Mr. Lewis's 25-year employment and the support systems that have enabled his transformation and reduce his risk to the community. A probationary period preserves these stabilizing factors while holding him accountable through intensive supervision and treatment conditions.

We respectfully request this Court grant a variance from the advisory guideline range to impose a two-year probationary sentence. This sentence is sufficient, but not greater than necessary, to comply with the sentencing aims in 3553(a). It considers the nature of the offense and Mr. Lewis's history and characteristics, his extraordinary post-

offense rehabilitation, his remorse and genuine acceptance of responsibility, his treatment needs, and the goals of sentencing.

                                                                   Respectfully submitted,
                                                                   **Brandt Kettwick Defense**

Dated:   December 24, 2025                       /s/ Nicole A. Kettwick
                                                                   Nicole A. Kettwick, Attorney No. 391329
                                                                   Attorney for Defendant